## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re: | |
| | Bankruptcy Case No: 20-12313 TBM |
| Saratoga and North Creek Railway, LLC, | Chapter 11 |
| | |
| Debtor. | |

---

## MEMORANDUM OPINION AND ORDER CONFIRMING CHAPTER 11 PLAN

---

## I.    Introduction.

Saratoga and North Creek Railway, LLC (the "Debtor") is a "common carrier" that filed for protection under Chapter 11 of the Bankruptcy Code.[1] After more than a year in its insolvency proceeding, the Debtor filed a Chapter 11 plan (as subsequently modified, the "Second Amended Plan"). The centerpiece of the Second Amended Plan is a proposed sale of the Debtor's largest non-cash asset: a real property easement created by virtue of a federal stipulated judgment (known as the "Saratoga Easement"[2]), along with 29.70 miles of rail tracks extending from North Creek, New York, northward to the Tahawus Mine located northeast of the Town of Newcomb, New York. The Debtor proposes to sell the Saratoga Easement to a stalking horse bidder under the terms of an asset purchase agreement appended to the Second Amended Plan but subject to the terms of bid procedures which contemplate a potential auction. The bid procedures require auction participants to agree to assume "the common carrier obligation to preserve the future operation of rail service on the Saratoga Easement." And the proposed acquisition is subject to approval (or exemption) by the Surface Transportation Board.

There were several objections submitted to the Second Amended Plan but only one remains: the joint objection of the State of New York, the New York State Department of Environmental Conservation, and the New York State Olympic Regional Development Authority (together, "New York"). New York contests confirmation on the basis of Sections 1129(a)(1), (3), and (7). The main thrust of New York's position is that the Debtor should abandon its stalking horse bidder and change the proposed bid procedures so that even bidders who do not agree to assume "the common carrier

---

[1]    All references to the "Bankruptcy Code" are to the United States Bankruptcy Code, 11 U.S.C. §101 *et seq.* Unless otherwise indicated, all references to "Section" are to sections of the Bankruptcy Code.

[2]    The Court identifies the Saratoga Easement in more detail in Section IV(B)(1)(a). The Saratoga Easement is a real property easement created through a federal court Stipulated Judgement (as defined in Section IV(B)(1)(a)). Except when otherwise indicated, the Court uses the term "Saratoga Easement" throughout this Opinion in the very broad sense of referring to the real property easement itself, rail tracks on the easement, and all associated railway facilities on the easement owned by the Debtor.

obligation to preserve the future operation of rail service on the Saratoga Easement" can participate.  New York has a buyer in mind who appears interested in a "rails-to-trails" approach whereby the Saratoga Easement and rail line would be converted to a hiking area.  The Debtor contends that such proposal is not viable and may lead to further delay.

The Court conducted a contested confirmation hearing and received evidence presented by the Debtor and New York.  With the benefit of that evidence and extensive legal argument, the Court ultimately concludes that the Debtor satisfied all of its burdens for confirmation of the Second Amended Plan under Sections 1129(a) and (b).  The Debtor's proposal is a cogent and thoughtful attempt to unlock value for the benefit of creditors who have voted overwhelmingly in favor of the Second Amended Plan.  And, ultimately, the Second Amended Plan may result in an auction generating even more consideration.

## II.    Jurisdiction and Venue.

This Court has jurisdiction over this Chapter 11 confirmation contest pursuant to 28 U.S.C. § 1334.  This dispute is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning administration of the estate), 157(b)(2)(L) (confirmations of plans), and 157(b)(2)(O) (other proceedings affecting the liquidation of assets of the estate or the adjustment of the debtor-creditor relationship).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  No party in interest has contested this Court's jurisdiction or venue in this Court.

## III.    Procedural Background.

The Debtor filed a Petition for protection under Chapter 11 of the Bankruptcy Code on March 30, 2020.[3]  In its Petition, the Debtor stated that it was not a "railroad (as defined in 11 U.S.C. § 101(44))."[4]  Shortly thereafter, the Debtor filed its Statement of Financial Affairs and Schedules, which have since been amended.[5]  At the Debtor's request, the Court entered an uncontested "Order Granting Joint Administration" whereby the Court authorized this bankruptcy case to be "jointly administered for procedural purposes only pursuant to Fed. R. Bankr. P. 1015(b)" with the separate but related bankruptcy railroad reorganization case captioned:  *San Luis & Rio Grande Railroad, Inc.*, Case No. 19-18905 (Bankr. D. Colo.) (the "SL&RG Bankruptcy Case").[6]  Over the next year and a half, the Debtor filed Monthly Operating Reports generally showing only nominal "cash receipts from operations."[7]  However, the Debtor generated approximately $539,000.00 from the assignment of certain 2018, 2019, and 2020 "45G

---

[3]     Docket No. 1.  Unless otherwise indicated, the Court will refer to particular documents contained in the CM/ECF docket for this Bankruptcy Case using the convention: "Docket No. ___."
[4]     *Id.* at 2.
[5]     Docket Nos. 30-36; 47-49; and 55-57; Debtor's Exs. 1 and 2.
[6]     Docket No. 42.
[7]     Docket Nos. 59-62; 64-70; 72; 75; 81; 83-84.

tax credits" and also received periodic income from lease of the Saratoga Easement and its common carrier reporting mark: SNC.[8]

On September 30, 2021, the Debtor filed its "Chapter 11 Plan of Liquidation" (the "Initial Plan")[9] and Disclosure Statement (the "Initial Disclosure Statement").[10]  In response to various objections to the Initial Disclosure Statement, the Debtor submitted an "Amended Disclosure Statement" (the "Amended Disclosure Statement").[11]  The Court conducted a contested hearing on the adequacy of the Amended Disclosure Statement after which the Court issued an Order "conditionally approv[ing]" the Amended Disclosure Statement subject to the submission of certain changes advanced by the Debtor during the hearing.[12]  In compliance with the Court's Order, the Debtor presented its "Second Amended Disclosure Statement" (the "Second Amended Disclosure Statement").[13]  Thereafter, the Court formally approved the adequacy of the Second Amended Disclosure Statement, established a schedule for notice and objections to the Initial Plan, and set a confirmation hearing (the "Confirmation Hearing").[14]

Three parties objected to the Debtor's Initial Plan as follows:

- The State of New York, the New York State Department of Environmental Conservation (the "NY DEC"), and the New York State Olympic Regional Development Authority (the "NY Olympic Authority") (together, "New York") filed a joint Objection (the "New York Objection").[15]

- The Open Space Institute Land Trust, Inc. (the "OSI") filed an Objection (the "OSI Objection").[16]

- The United States Trustee (the "UST") filed an Objection (the "UST Objection").[17]

In advance of the Confirmation Hearing, the Debtor presented a "Summary Report of Ballots Received" wherein the Debtor tabulated votes received from Class 3 Unsecured Creditors (the "Ballot Report").[18]  The Ballot Report shows that ten unsecured creditors voted on the Initial Plan.  Nine voted to accept and one voted to reject.  The sole rejecting unsecured creditor is the NY Olympic Authority, which asserted a claim of just $2,821.00.  Together, the ten unsecured creditors voting on the

---

[8]     *Id.*
[9]     Docket No. 85; Debtor's Ex. 5.
[10]    Docket No. 86.
[11]    Docket No. 99.
[12]    Docket No. 101.
[13]    Docket No. 102; Debtor's Ex. 4.
[14]    Docket No. 103.
[15]    Docket No. 108.
[16]    Docket No. 110.
[17]    Docket No. 111.
[18]    Docket No. 115; Debtor's Ex. 6.

Initial Plan hold claims against the Debtor totaling $5,290,372.31.  The nine accepting votes represent 99.95% ($5,287,551.31) of the dollar amount of voting Class 3 Unsecured Claims.

Prior to the Confirmation Hearing, the Debtor submitted a "Motion to Strike" the OSI Objection arguing that OSI is not a "party in interest" under Section 1109(b), is not entitled to object under Section 1128(b), and lacks standing to object to the Initial Plan (the "Motion to Strike").[19]  OSI responded in writing contesting the Debtor's position and requesting to be heard.[20]

In response to some of the Objections, the day before the Confirmation Hearing, the Debtor submitted a new "Amended Plan of Liquidation" (the "Amended Plan").[21] The Amended Plan contained relatively minor proposed changes which have no material impact on creditors.  No party suggested that further notice, voting, or any additional opportunity to object to the Amended Plan is warranted.  So, the Amended Plan became the operative Chapter 11 plan for purposes of the Confirmation Hearing.

The Court conducted a contested Confirmation Hearing on December 17, 2021. After receiving input from the respective participants concerning the sequence and procedure for the Confirmation Hearing, the Court elected to address the Motion to Strike first.  The Court entertained additional legal argument from counsel for both the Debtor and OSI (neither of which requested an evidentiary hearing on the Motion to Strike).  After considering the issues, the Court made an Oral Ruling including findings of fact and legal conclusions.  The Court determined that OSI's role in this bankruptcy case is only as a potential purchaser of the Saratoga Easement.  The Court concluded that OSI is not a creditor, an equity security holder, an indenture trustee, or otherwise a "party in interest" under Section 1109(b).  Thus, OSI was not entitled to object to the Amended Plan per Section 1128(b).  Furthermore, the Court decided that OSI lacked standing (both constitutional standing and prudential standing) to participate in the confirmation process.  Accordingly, for the reasons explained in more detail in the Court's Oral Ruling, the Court granted the Motion to Strike and barred further participation by OSI.

Thereafter, the Court again addressed the confirmation process and status.  The Debtor announced that it had reached an agreement with the UST to further amend the Amended Plan by making minor changes to Paragraphs 6.1(e)(1)(f), 6.1(g), and 6.1(g)(4)(1).  The Debtor read the proposed changes into the record.  None of the proposed changes materially affects creditors.  Based upon the additional changes, the UST withdrew the UST Objection and did not further participate in the Confirmation Hearing.

With the consent of the parties, the Court proceeded with the Confirmation Hearing in a hybrid fashion starting with proffers of testimony and exhibits.  The Debtor

---

[19]     Docket No. 116.
[20]     Docket No. 118.
[21]     Docket Nos. 119 and 120.

offered Exhibits 1-16.  New York did not object.  So, the Court admitted Debtor's Exhibits 1-16 into evidence.  The Debtor made detailed oral evidentiary proffers of testimony from:  William A. Brandt, Jr. (the Chapter 11 Trustee of the sole member of the Debtor); Daniel Elliott (counsel for Revolution Rail Holding Co., LLC ("Revolution Rail")); Robin DeLoria (Supervisor of the Town of Newcomb, New York); and Michael DuPee (President of Revolution Rail).  New York interposed a few evidentiary objections and asserted its right to cross-examine the witnesses.  The Court ruled on certain evidentiary objections but reserved ruling on the balance unless re-asserted by New York after cross-examination of the witnesses.  The Debtor made all of its witnesses available for cross-examination.  Counsel for New York cross-examined only Messrs. Brandt and DeLoria and did not re-raise any evidentiary objections.

Thereafter, New York offered Exhibits 1-4 into evidence.  The Debtor did not object.  So, the Court admitted New York's Exhibits 1-4.  Then, New York made an evidentiary proffer of testimony from Katherine Smith (a mine and reclamation law specialist with the NY DEC).  The Debtor waived its right to cross-examine Ms. Smith.

At that stage, both the Debtor and New York acknowledged that they had completed their presentation of evidence on confirmation issues.  The Court determined that no further evidentiary hearing was necessary or warranted since both the Debtor and New York had a full and fair opportunity to present evidence at the Confirmation Hearing by virtue of oral proffers of testimony coupled with cross-examination.  There were no objections to such procedure and no disputes of material factual matters.  Thereafter, the Court received fulsome closing legal argument from counsel for both the Debtor and New York.  Counsel for the Debtor requested the opportunity to submit a Second Amended Plan containing the minor modifications recited orally on the record to resolve the UST Objection.

The Court took the confirmation issues under advisement.  Shortly thereafter, the Debtor filed its "Second Amended Plan of Liquidation" (the "Second Amended Plan") containing the modifications its counsel had recited on the record.[22]  Thus, the Second Amended Plan is the operative plan which the Court must evaluate.[23]  In the interim since the Confirmation Hearing and submission of the Second Amended Plan, the Court has reviewed the Second Amended Plan and all admitted exhibits, considered all the testimony (both proffered and by way of cross-examination), and evaluated the

---

[22]     Docket No. 122.

[23]     When analyzing confirmation standards, the Court will reference the Second Amended Plan somewhat broadly.  For example, the Court will describe votes on the Second Amended Plan even though creditors voted on the Initial Plan.  And the Court will construe the Objections as having been filed against the Second Amended Plan even though the Objections were originally lodged against the Initial Plan.  Nevertheless, the Court uses the Second Amended Plan broadly for ease of reference and readability and also because it is the most current iteration.  Under Section 1127(a) any amended Chapter 11 plan filed before confirmation "becomes the plan."  Also, per Fed. R. Bankr. P. 3019(a) (which governs modification of Chapter 11 plans before confirmation), the Court finds that the proposed modifications advanced by the Debtor in the Second Amended Plan "do[ ] not adversely change the treatment of the claim of any creditor . . . who has not accepted in writing the modification . . . ."  So, the Second Amended Plan is the operative plan and is deemed accepted or rejected by creditors by virtue of their votes on the Initial Plan.

applicable law governing Chapter 11 plan confirmation.  The matter is now ripe for decision.

## IV.     Factual Findings.

The Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052 and 9014(c), based upon the admissible evidence presented at the Confirmation Hearing (including both testimony and exhibits):

## A.     The Debtor.

The Debtor is a limited liability company and common carrier[24] under the jurisdiction of the Surface Transportation Board (the "STB").  The Debtor's membership interests are wholly owned by the San Luis & Rio Grande Railroad, Inc. (the "SL&RG").  The SL&RG is itself a Chapter 11 debtor in the SL&RG Bankruptcy Case.  At the time that the Court entered an Order for Relief in the SL&RG Bankruptcy Case (November 7, 2019), the SL&RG was actively engaged in the transportation of individuals and property as a common carrier.  The SL&RG qualified as a "railroad" under Section 101(44), which defines a "railroad" as a "common carrier by railroad engaged in the transportation of individuals or property or owner of trackage facilities leased by such common carrier."  As a result, the SL&RG Bankruptcy Case is a railroad reorganization proceeding under Subchapter IV of Chapter 11.  Section 1163 requires that a Chapter 11 trustee be appointed in a railroad reorganization based upon a short list recommended by the Secretary of Transportation.  William A Brandt, Jr. was selected as the Chapter 11 Trustee for the SL&RG.  In his capacity as Chapter 11 Trustee of the SL&RG and because the SL&RG wholly owns the Debtor, Mr. Brandt effectively controls the Debtor and executed the Debtor's bankruptcy Petition.

As the Debtor's full corporate name suggests — Saratoga and North Creek Railway LLC — the Debtor is a railway company located in Upstate New York.  However, the Debtor is not technically a "railroad" within the narrower statutory bankruptcy meaning of Section 101(44) because the Debtor has not engaged in active rail service since 2018.  As a result, in the Petition, the Debtor disclaimed that it was a "railroad" under Section 101(44).  The Debtor made that decision after consultation with the Federal Railroad Administration.  Thus, unlike the SL&RG Bankruptcy Case, the Debtor's bankruptcy case is not a railroad reorganization governed by Subchapter IV of Chapter 11.  Instead, this bankruptcy case is proceeding under the typical Chapter 11 process.  Despite the Debtor's disclaimer of statutory bankruptcy "railroad" status, the Debtor still is a common carrier under federal transportation law.

The Debtor is not currently an operating company.  It has no employees or managers (except Mr. Brandt who serves in the role of Chapter 11 Trustee of the SL&RG which is the sole member of the Debtor).  The Debtor's only current source of

---

[24]    *See* 49 U.S.C. § 11101 (governing "common carrier" transportation, services, and rates: "A rail carrier providing transportation or service subject to the jurisdiction of the Board . . . shall provide transportation or service on reasonable request.").

recurring income is from leases of part of the Saratoga Easement and its common carrier reporting mark:  SNC.  The Debtor has certain assets (described below) which it seeks to liquidate for the benefit of creditors.  The Debtor does not intend to rehabilitate its pre-2018 railway business.

**B.    The Debtor's Assets and Liabilities.**

    **1.    Assets.**

The Debtor has only a handful of assets which include:  (1) the Saratoga Easement; (2) cash; (3) the Debtor's common carrier car mark; and (4) potential legal claims.

    **a.    The Saratoga Easement.**

The Debtor's most significant non-cash asset is its ownership of the Saratoga Easement and related trackage facilities.  The Saratoga Easement is a real property easement including 29.70 miles of rail tracks extending from North Creek, New York northward to the Tahawus Mine located northeast of the Town of Newcomb, New York. The Saratoga Easement stems from a Stipulated Judgment entered on October 17, 1962 (the "Stipulated Judgment")[25] by the United States District Court for the Northern District of New York (the "New York Federal Court") in the case captioned: *United States v. 220 Acres of Land, More or Less, Situate in the Counties of Essex and Hamilton, State of New York, and the State of New York*, Civil Action No. 8431 (N.D.N.Y.).  Exhibit A to the Stipulated Judgment contains a legal description of the Saratoga Easement which also has sometimes been described as the "Tahawus Branch," the "Tahawus Line," the "Tahawus Corridor," and the "Tahawus Branch Railroad Corridor."  New York introduced a map showing the Saratoga Easement.[26]

The Stipulated Judgment derives from a "Complaint in Condemnation" brought by the United States against New York because the United States:

> . . . determined that an easement for a period of 100 years was necessary for the location, relocation, construction, maintenance, operation and removal of railroad facilities in, over, upon and across certain lands [the Saratoga Easement] owned by the defendant The People of the State of New York . . . .[27]

Prior to the Stipulated Judgment, in 1942, the United States acquired a temporary easement over the same lands which were then used for railway purposes. The long-term (100-year) Saratoga Easement superseded the prior temporary easement.  In the Stipulated Judgment, the United States and New York agreed that:

---

[25]    Debtor's Ex. 11.
[26]    NY Ex. 2.
[27]    Debtor's Ex. 11 at 3.

> . . . the public use for which said lands [the Saratoga Easement] are sought to be acquired is to adequately provide for a railroad line over which strategic materials necessary for the United States may be transported.[28]

Based upon agreement between the United States and the State of New York, the New York Federal Court "ordered, adjudged and decreed":

> That the sum of Six Thousand, Three Hundred Fifty Dollars ($6,350.00), including interest, represents just compensation which should be paid by the United States of America for acquisition of an easement for a period of 100 years for the location, relocation, construction, maintenance, operation and removal of railroad facilities in, over, upon and across certain lands [the Saratoga Easement] . . . owned by the defendant The People of the State of New York . . . .
> . . . .
>
> That said sum [$6,350.00] . . . shall be deposited into the Registry of this Court by the Plaintiff, United States of America [for payment to the State of New York] . . . .
> . . . .
>
> That said sum [$6,350.00] . . . shall be considered to be and shall be accepted in full payment and satisfaction of any and all claims against the United States of America which [the State of New York] . . . may have for, by reason of, or arising out of the acquisition by the United States of America of the [Saratoga] easement . . . .[29]

The 100-year term of the Saratoga Easement extends through October 17, 2062. Before and after the Stipulated Judgment (at least since 1942), the Saratoga Easement has been used as a railway. The Debtor purchased the Saratoga Easement in 2011. At the same time, the Debtor obtained authorization from the STB to provide common carrier services across the Saratoga Easement. The Debtor provided limited freight rail service on the Saratoga Easement (including the shipment of minerals from the Tahawus Mine) until 2018 when regular freight service ended because of financial issues. The railway track in the Saratoga Easement is fully operable. After 2018 and as recently as March 2021, the Debtor has permitted limited movement of freight cars on the Saratoga Easement. Furthermore, prior to its bankruptcy Petition, the Debtor entered into an "Agreement for Use of Track" with Revolution Rail Company Adirondack, LLC ("Revolution Adirondack") pursuant to which Revolution Adirondack agreed to operate a railroad pedal bike business on a portion of the rail tracks on the

---

[28] *Id*. at 6.
[29] *Id*. at 1-2.

Saratoga Easement in return for payments to the Debtor.[30]  With the Court's authorization, the Debtor extended the railroad pedal bike business arrangement with Revolution Adirondack post-bankruptcy during 2020 and 2021.[31]

Significant portions of the Saratoga Easement run next to the scenic Hudson and Boreas rivers.  The Saratoga Easement is located slightly southwest of the center of the Adirondack Park.  The Adirondack Park is a publicly protected area of Upstate New York consisting of approximately six million acres, including approximately 2.6 million acres owned by the State of New York.  The State of New York, through the NY DEC and other state agencies, manages the Adirondack Park to conserve its natural resources and provide recreational access.  Notwithstanding the Stipulated Judgment, New York opposes use of the Saratoga Easement for railway operations.  As set forth in more detail below, the Debtor seeks to sell the Saratoga Easement for the benefit of creditors while New York is attempting to force the abandonment of the Saratoga Easement.

### b.   Other Assets.

With respect to cash, the Debtor started this bankruptcy case with approximately $300,000.00 in a bank account.[32]  Post-petition, the Debtor realized approximately $539,000.00 from the assignment of certain 2018, 2019, and 2020 "45G tax credits."  The Debtor also received periodic income from the "Agreement for Use of Track" on the Saratoga Easement as well as lease of the Debtor's common carrier reporting mark: SNC.  As a result, the Debtor's cash position increased to approximately $1,000,000.00.  Pursuant to a Court-approved settlement agreement, the Debtor recently paid $300,000.00 to a creditor, Big Shoulders Capital, LLC ("Big Shoulders").  Accordingly, as of the Confirmation Hearing, the Debtor retained approximately $700,000.00 in cash.[33]

In addition to cash, the Debtor also owns the common carrier railway mark: SNC.  In its Schedule A/B, the Debtor listed the value of the mark as "unknown."[34]  However, the Debtor is a party to a "Car Mark Use Agreement" pursuant to which the Debtor leases the mark to CAI Rail, Inc. ("CAI Rail").  During the pendency of the bankruptcy case, the Debtor has continued to receive regular periodic income from CAI Rail for use of the SNC mark.

The only other assets identified by the Debtor during the bankruptcy process are "causes of action against third parties."[35]  However, the Debtor has not provided many particulars and identified the value of such claims as "unknown."[36]

---

[30]    Docket Nos. 27 and 52.
[31]    *Id.*
[32]    Debtor's Ex. 1; Docket Nos. 31, 56, and 59.
[33]    Debtor's Ex. 7.
[34]    Debtor's Ex. 1; Docket Nos. 31 and 56.
[35]    *Id.*
[36]    *Id.*

2.    **Liabilities**.

In its Schedules D and E/F, the Debtor identified three secured creditors, 33 priority unsecured creditors, and 77 general unsecured creditors.  The Debtor listed all creditor claims as "disputed."[37]  The Court established a Bar Date for the filing of proofs of claim.[38]  Thereafter, creditors filed 18 claims aggregating $15,631,642.47.[39]

The most significant claim is Claim No. 14-1 filed by Big Shoulders as a secured claim for $7,661,532.55.  The Debtor entered into a Settlement Agreement with Big Shoulders resolving Claim No. 14-1 by providing that such claim "shall be limited, reduced, and allowed for all purposes in the [Debtor's] Case as a fully secured claim in the amount of $300,000.00" and paid promptly.[40]  Thereafter, the Court approved the Settlement Agreement, and the Debtor paid Big Shoulders $300,000.00.[41]  The second largest claim is Claim No. 13-1 filed by Sandton Rail Co., LLC ("Sandton") as a general unsecured claim for $3,482,474.79.[42]  Although the Debtor may dispute the amount of Claim No. 13-1, Sandton voted to accept the Second Amended Plan.  The third largest claim is Claim No. 3-1 filed by the Internal Revenue Service (the "IRS"), originally as a secured claim for $1,574,327.28 and unsecured claim for $23,271.82.[43]  Subsequently, the IRS amended Claim No. 3-1 to a $1,609,449.10 unsecured claim, of which $421,880.54 is asserted to have priority status under Section 507(a)(8).[44]  The IRS did not vote on the Second Amended Plan.  The fourth largest claim is Claim No. 11-1 filed by Stephen Schott as a general unsecured claim for $1,439,326.00.[45]  Mr. Schott voted to accept the Second Amended Plan.  All of the other claims against the Debtor are orders of magnitude smaller than the foregoing.  Notably, the NY DEC did not file a proof of claim against the Debtor and so is not a creditor.  However, the NY Olympic Authority filed Claim No. 18-1 as a general unsecured claim for $2,821.00.[46]

C.    **The STB Abandonment Case**.

On September 7, 2018, the NY DEC filed an adverse abandonment petition against the Debtor with the STB: STB Case No. AB 1261 (the "STB Abandonment Case").  Through the STB Abandonment Case, New York sought to prohibit use of the Debtor's rail tracks on the Saratoga Easement for railroad transportation services and to prohibit any and all storage of rail cars on the Saratoga Easement.  Abandonment requires the STB to determine there is no present or future public need for rail service

---

[37]    Docket No. 32.
[38]    Debtor's Ex. 13.
[39]    Debtor's Ex. 3 (Claims Register).
[40]    Debtor's Ex. 14.
[41]    *Id*.
[42]    Debtor's Exs. 3 and 16.
[43]    Claims Register, Claim No. 3-1.
[44]    *Id*., Claim No. 3-3.
[45]    Debtor's Ex. 3.
[46]    *Id*.

over the Saratoga Easement and that abandonment will not have serious, adverse impact on rural and community development.[47]

About a year after the commencement of the STB Abandonment Case, on October 18, 2019, New York sent a letter to the STB co-signed by David Michaud (listed as General Counsel, Iowa Pacific Holdings, LLC, Counsel for Saratoga and North Creek Railway), stating:

> . . . . we write jointly to inform the Board that SNCR is willing to negotiate an interim trail use agreement with the Department. In addition, SNCR has no objection to proceeding with the pending abandonment on a voluntary basis. Accordingly, SNCR irrevocably represents that it does not now and will not in the future oppose the Department's abandonment application, and that public convenience and necessity favor abandonment of the subject line [Saratoga Easement].[48]

Mr. Michaud's capacity to purportedly commit the Debtor to abandon the Debtor's most significant non-cash asset — the rail line over the Saratoga Easement — for no consideration appears uncertain because the letter was executed and sent on October 16, 2019, which was two days after the Petition commencing the involuntary SL&RG Bankruptcy Case had been filed.[49] And, although the Debtor itself had not yet filed for bankruptcy protection, neither Mr. Michaud nor the SL&RG obtained Court approval for SL&RG (the parent of the Debtor) to effectively cause a non-ordinary course disposition — abandonment — of a material asset of SL&RG (i.e., gutting the value of its wholly-owned subsidiary).

In any event, after Mr. Brandt was appointed Chapter 11 Trustee of the SL&RG on December 30, 2019, he took immediate control of the SL&RG's membership interests in the Debtor and caused the Debtor to retract its alleged consent to abandonment of the rail lines on the Saratoga Easement. Since it filed for bankruptcy, the Debtor has continued to oppose abandonment as part of the Debtor's strategy to secure value for creditors. The Debtor filed a Motion to Dismiss the STB Abandonment Case. Mr. Brandt testified that he anticipates that STB will deny abandonment of the rail lines on theSaratoga Easement because of the opposition of the Debtor and local New York municipalities. Mr. DeLoria confirmed that the Town of Newcomb, New York, and Essex County, New York, both oppose abandonment of the rail lines on the Saratoga Easement. Mr. Brandt also testified that he believes that the presence of the Tahawus Mine and the potential need for freight rail transportation service to the Tahawus Mine may serve as a basis for the STB to deny abandonment of the rail lines

---

[47]   Mr. Brandt testified to the foregoing. However, as set forth below, Mr. Brandt's testimony is corroborated by and entirely consistent with the federal statute governing abandonment of railroad lines. 49 U.S.C. § 10903(d).
[48]   NY Ex. 1.
[49]   Debtor's Ex. 10.

on the Saratoga Easement.  In any event, at this stage, the STB Abandonment Case remains pending.  The STB has not acted on the purportedly "irrevocable" letter co-signed by Mr. Michaud on October 18, 2019.  More to the point, at this stage the STB has not approved abandonment of the rail lines on the Saratoga Easement.  The Debtor remains a common carrier subject to the jurisdiction of the STB and the sale or abandonment of the rail lines on the Saratoga Easement is subject to the jurisdiction of the STB.[50]

**D.    The Second Amended Plan.**

The Debtor filed the Initial Plan as later modified by the Amended Plan and the Second Amended Plan.  As the title of the Second Amended Plan suggests, the Debtor proposes a liquidation.  The Debtor's most significant non-cash asset is the Saratoga Easement.  The Debtor proposes "to sell the Saratoga Easement to a purchaser who will assume the common carrier obligation to resume rail service."[51]  The Debtor made the decision to require any potential purchaser to be willing to assume the common carrier obligation to resume rail service for several reasons.  The Debtor remains a common carrier subject to the jurisdiction of the STB.  The Debtor contends that the STB must authorize or approve any sale of the Saratoga Easement.  Mr. Brandt testified that he believes that unless and until the STB authorizes the abandonment of the rail lines on the Saratoga Easement, any potential purchaser would be obligated to assume the common carrier obligation and prohibited from liquidating rail tracks on the Saratoga Easement.  Further, Mr. Brandt testified that he does not believe that the STB will authorize abandonment of the rail lines on the Saratoga Easement.  As a result of such views, the Debtor contends that the most expeditious and certain path toward realizing value from the sale of the Saratoga Easement is by sale to "a purchaser who will assume the common carrier obligation to resume rail service."

---

[50]    After the Confirmation Hearing and closing of the evidence, New York filed a letter with the Court noting a recent development in the STB Abandonment Case and attaching a "Decision" from the STB, dated January 11, 2022 (the "2022 STB Decision").  (Docket No. 126.)  In the 2022 STB Decision, the STB denied the Debtor's Motion to Dismiss the STB Abandonment Case as well as the Debtor's request to expedite consideration of the STB Abandonment Case.  The STB decided that "[a]s this matter has been in abeyance for nearly two years . . . an expedited decision [on abandonment] is not now warranted."  Instead, the STB effectively determined that abandonment issues should be decided on the merits (rather than through the Motion to Dismiss).  And, the STB noted that further information and/or developments may better inform the STB (*i.e.,* "parties might suggest additional briefing . . . ."; "the Bankruptcy Court could refer specific issues to the Board for adjudication"; or "parties could wait until after the conclusion of the Bankruptcy Court proceeding before approaching the Board to resolve the adverse abandonment application").  As the Court understands the 2022 STB Decision, the contested adverse abandonment issues continue to remain pending for ultimate decision on the merits by the STB.  So, the 2022 STB Decision does not appear to have any real import with respect to confirmation of the Second Amended Plan and there is no need for the Court to "refer specific issues to the Board for adjudication."  The Court simply assumes that subsequent to the entry of this Opinion, the Debtor will promptly complete the process for sale of the Saratoga Easement following the Bid Procedures in the Second Amended Plan which may require in an auction.  Then, the Debtor and the successful bidder (whether Revolution Rail or another purchaser) likely will need to quickly return to the STB for approval of any proposed acquisition (or exemption from such approval) which may also require decision on abandonment issues.
[51]    Debtor's Ex. 4 at 9; Docket No. 102.

After the Debtor filed for bankruptcy protection, the Debtor began the process of marketing and selling the Saratoga Easement to potential purchasers.  The Debtor set up a data room and entered into Non-Disclosure Agreements with about 15-20 interested parties.  The Debtor conducted negotiations and discussions with numerous interested parties concerning a possible sale.

After approximately a year of active marketing, in August 2021, the Debtor entered into an arms-length "Asset Purchase Agreement" (the "APA") with Revolution Rail.  The APA was attached to the Initial Plan, Amended Plan, and Second Amended Plan.[52]  Under the APA, the Debtor agreed to sell to Revolution Rail all rail lines located on the Saratoga Easement, along with all associated real property, personal property, and facilities, including: roadbeds; tracks; bridges; culverts; signals and communications facilities; dispatching systems and equipment; stations; depots; yards; shops; parking and storage facilities; buildings and structures; facilities and fixtures trackage rights agreements; unexpired real and personal property leases; inventory; intellectual property; the name "Saratoga and North Creek Railway, LLC" (including the common carrier mark SNC); rights under the "Car Mark Use Agreement" with CAI Rail; and rights under the "Agreement for Use of Track" with Revolution Adirondack (together, the "Assets").[53]  In other words, to generalize, the Debtor agreed to sell all of its Assets except cash and causes of action.  Revolution Rail agreed to pay $700,000.00 to purchase the Assets.  The APA is subject to approval by the Court and approval by the STB (or an exemption).  Revolution Rail made a deposit of $25,000.00 in connection with the proposed transaction.  The APA is also subject to "other offers presented to the [Debtor] solely in accordance with the Bid Procedures [set forth in the Second Amended Plan]."  So, in bankruptcy vernacular, the APA is a "stalking horse" bid.[54]  Mr. Brandt credibly and repeatedly testified that the Second Amended Plan (including the APA and Bid Procedures) represents his best business judgment and will provide the greatest return to the Debtor's creditors on a prompt basis.  There is no evidence that the Debtor entered into the APA with an improper or bad motive, nor that there was any collusion.

The Second Amended Plan is built on the foundation of the APA.  In the Second Amended Plan, the Debtor states that it seeks approval of the sale of the Assets to Revolution Rail "or to a competing bidder that submits a higher and better offer in accordance with the Bidding Procedures" set forth the Second Amended Plan.  The Bidding Procedures are listed in detail in Article VI of the Second Amended Plan and include procedures for: a bidding process; sale participation requirements; due diligence; bid requirements; open bid requirements; an auction (if other Qualified Bids are submitted); a back-up bidder; and a sale hearing in the Court.  The Bidding Procedures are fairly typical for a significant asset sale in a Chapter 11 bankruptcy

---

[52]     Debtor's Exs. 4 and 8.

[53]     The foregoing listing of assets to be sold under the APA is merely a summary for purposes of convenient description.  The APA describes the Assets with more detail and specificity.

[54]     "A 'stalking horse' contract is a first, favorable bid strategically solicited by the bankrupt company to prevent low-ball offers."  *Rumsey Land Co., LLC v. Resource Land Holdings, LLC*, 944 F.3d 1259, 1266 n.2 (10th Cir. 2019) (quoting *In re WestPoint Stevens, Inc.*, 600 F.3d 231, 239 n.3 (2d Cir. 2010).

under Section 363(b), but are incorporated in the Second Amended Plan rather than in a free-standing bid procedures or sale motion.

The main thrust of the New Objection focuses on three discrete but related parts of the Bid Procedures that New York contests: Article VI Paragraphs 6.1(e)(1)(f), 6.1(g), and 6.1(g)(4)(1).

Paragraph 6.1(e)(1)(f) of the Initial Plan provided:

> Public Interest. Each and every competing Bid must indicate that the potential purchaser shall protect the public interest as set forth in 11 U.S.C. § 1165 by preserving the operation of rail service on the rail lines.

By the Second Amended Plan, the Debtor modified such text to state as follows:

> Public Interest. Each and every competing Bid must indicate that the potential purchaser shall protect the public interest by assuming the common carrier obligation to preserve the future operation of rail service on the Saratoga Easement.

Similarly, Paragraph 6.1(g) of the Initial Plan provided:

> The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes a Successful Bid shall take into account any factors the Plan Administrator reasonably deems relevant to the value of the Qualified Bid to the Debtor's estate, including, among other things: (a) the total consideration; (b) the public interest consistent with 11 U.S.C. § 1165; and (c) the likelihood of the Bidder's ability to close a transaction, the conditions thereto, and the timing thereof.

By the Second Amended Plan, the Debtor modified such text to state as follows:

> The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes a Successful Bid shall take into account any factors the Plan Administrator reasonably deems relevant to the value of the Qualified Bid to the Debtor's estate, including, among other things: (a) the total consideration; (b) the public interest as defined by assuming the common carrier obligation to preserve the future operation of rail service on the Saratoga Easement; and (c) the likelihood of the Bidder's ability to close a transaction, the conditions thereto, and the timing thereof.

14

Finally, Paragraph 6.1(g)(4)(1) of the Initial Plan provided:

> When determining the highest or otherwise best Qualified
> Bid, as compared to other Qualified Bids, the Plan
> Administrator may consider the following factors in addition
> to any other factors that the Plan Administrator deems
> appropriate: (i) the amount and nature of the total
> consideration; (ii) the likelihood of the Bidder's ability to close
> a transaction, the timing thereof; (iii) such Bidder's
> connections with the Debtor; (iv) the Bidder's ability to
> continue and maintain operations of the Debtor, and (v) the
> public interest as defined in 11 U.S.C. § 1165.

By the Second Amended Plan, the Debtor modified such text to state as follows:

> When determining the highest or otherwise best Qualified
> Bid, as compared to other Qualified Bids, the Plan
> Administrator may consider the following factors in addition
> to any other factors that the Plan Administrator deems
> appropriate: (i) the amount and nature of the total
> consideration; (ii) the likelihood of the Bidder's ability to close
> a transaction, the timing thereof; (iii) such Bidder's
> connections with the Debtor; (iv) the Bidder's ability to
> continue and maintain operations of the Debtor, and (v) the
> public interest as defined by assuming the common carrier
> obligation to preserve the future operation of rail service on
> the Saratoga Easement.

As is apparent from the foregoing three provisions and changes, the Debtor
eliminated all references to Section 1165 (a statute applicable only in Chapter 11
Subchapter IV railroad reorganizations) and instead substituted language referring to
the "common carrier obligation to preserve the future operation of rail service on the
Saratoga Easement."

The balance of the Second Amended Plan deals with classification of claims and
interests, treatment of unclassified claims, treatment of classified claims, acceptance or
rejection, implementation, claims resolution, executory contracts and unexpired leases,
retention of jurisdiction, and standard boilerplate. Most of such provisions are quite
typical in Chapter 11. Under the Second Amended Plan, only Class 3 General
Unsecured Claims were impaired and entitled to vote to accept or reject.

**E.    Voting on the Second Amended Plan.**

Class 3 General Unsecured Creditors voted rather overwhelmingly in favor of
confirmation of the Second Amended Plan. Of the ten Class 3 General Unsecured

Creditors who voted, nine voted in favor.  Only the NY Olympic Authority voted to reject. In terms of the dollar amount of voting claims, the ten unsecured creditors voting on the Second Amended Plan hold claims against the Debtor totaling $5,290,372.31, while the NY Olympic Authority holds a claim for the nominal amount of $2,821.00  The nine accepting votes represent 99.95% ($5,287,551.31) of the dollar amount of voting Class 3 Unsecured Claims.  The only rejecting vote represents only 0.05% of the dollar amount of voting Class 3 Unsecured Claims.

F.    **The STB Revolution Rail Exemption Denial.**

As set forth above, Revolution Rail is the stalking horse bidder under the APA and the Second Amended Plan.  Prior to the Confirmation Hearing (and before any auction which might be required under the Bidding Procedures set forth in the Second Amended Plan), Revolution Rail jumped the gun by approaching the STB and filing (on August 11, 2021) "a verified notice of exemption under 49 C.F.R. § 1150.31 to acquire from [the Debtor] approximately 29.71 miles of rail line [constituting the Saratoga Easement]."[55]

On September 10, 2021, the STB denied Revolution Rail's request because "the proposed acquisition does not qualify as a routine matter appropriate for the class exemption procedures."[56]  The STB further explained:

> . . . there is uncertainty here because [Revolution Rail] does not already have an agreement with [the Debtor] to acquire the Line, and [Revolution Rail] does not know whether it will be the successful bidder . . . [and] there is no indication in the record that a schedule for the bidding process has been established in the bankruptcy proceeding.[57]

The STB also indicated that the Revolution Rail exemption request was "not clear [whether Revolution Rail] is interested in providing freight rail service rather than solely rail biking."[58]  The STB denial makes clear that Revolution Rail's request was premature and unclear.  Accordingly, the STB did not decide on the merits whether Revolution Rail could acquire the Saratoga Easement under the APA if it were the sole bidder or if it were to prevail in any potential auction.  In any event, Revolution Rail's President (Michael DuPee) and General Counsel (Daniel Elliott) both testified by way of proffer that if Revolution Rail is the successful bidder for the Saratoga Easement:  (1) Revolution Rail is prepared to undertake the common carrier obligation to preserve the future operation of rail service on the Saratoga Easement; (2) Revolution Rail intends to obtain STB approval of the sale; and (3) Revolution Rail is ready and willing to proceed to close the transaction.

---

[55]    STB Decision Docket No. FD 36535, Debtor's Ex. 9.
[56]    *Id.*
[57]    *Id.*
[58]    *Id.*

16

**G.**    **The OSI Bid.**

After the Debtor filed its Initial Disclosure Statement and Initial Plan, the Debtor received a proposal from OSI to purchase the Saratoga Easement for approximately $1,500,000.00 (the "OSI Bid").  Such amount is greater than the purchase price under the APA with Revolution Rail.  Neither the Debtor nor New York introduced any written offer from OSI into evidence during the Confirmation Hearing.  However, Mr. Brandt testified that the OSI proposal is contingent on the Debtor withdrawing its Motion to Dismiss the STB Abandonment Case and consenting to abandonment of the rail lines on the Saratoga Easement followed by a "rail banking" process.  The Debtor elected not to pursue such transaction with OSI for multiple reasons.  First, Mr. Brandt stated that he had negotiated the APA with Revolution Rail and believed that he was bound by good faith to follow through with the stalking horse APA.  Second, Mr. Brandt noted that the Second Amended Plan contemplated a competitive bidding and auction process so Revolution Rail may not be the winning bidder and the purchase price may increase.  Third, Mr. Brandt contended that OSI's insistence that the Debtor abandon the Saratoga Easement was not viable and would lead to delay.  He noted that municipalities and counties located near the Saratoga Easement contest abandonment and he does not believe that the STB will permit abandonment.  Fourth, Mr. Brandt noted that the OSI Bid does not contemplate an auction process.  Fifth, Mr. Brandt questioned whether the Debtor would continue to have any rights at all under the Saratoga Easement if the rail lines were abandoned.  In any event, the Debtor's  business judgment is that the OSI Bid is not feasible, would lead to delay, and would not be in the best interests of creditors.

**H.**    **The Tahawus Mine.**

The north end of the Saratoga Easement terminates at the Tahawus Mine. Although it has produced minerals in the past, the Tahawus Mine is not currently mining titanium.  Mr. Brandt and Mr. DeLoria (the Supervisor of the Town of Newcomb which is located near the Tahawus Mine) both testified credibly that the Tahawus Mine is a titanium mine.  Counsel for New York seemed to suggest otherwise in cross-examination questions but presented no contrary evidence.  Mr. Brandt visited the area of the Tahawus Mine many times and has conferred with the owner, Paul Mitchell of Mitchell Stone Products.  Mr. Mitchell advised the Debtor that Mitchell Stone Products currently sells aggregate by truck but intends to reopen the Tahawus Mine to produce titanium.  However, according to Ms. Smith (a mine and reclamation law specialist with the NY DEC), Mitchell Stone Products' current five-year permit does not include authorization to mine titanium.  And, while Mitchell Stone Products intends to file an application to mine titanium, it has not done so yet.  New York appears to oppose further titanium mining at the Tahawus Mine.  But, if titanium mining is authorized, Mitchell Stone Products may require rail transportation service.

In 2017, President Trump issued Executive Order No. 13817 directing the Department of the Interior to publish a "list of critical minerals."[59]  A "critical mineral" is:

> . . . a mineral identified by the Secretary of Interior . . . to be (i) a non-fuel mineral or mineral material essential to the economic and national security of the United States, (ii) the supply chain of which is vulnerable to disruption, and (iii) that serves an essential function in the manufacturing of a product, the absence of which would have significant consequences for our economy and national security.[60]

Thereafter, the Secretary of the Interior identified titanium as one of 35 "critical minerals" for the United States.[61]  The Court did not receive evidence concerning the quality or quantity of titanium at the Tahawus Mine, the economic feasibility of mining titanium at the Tahawus Mine, nor the environmental impacts of potential titanium mining at the Tahawus Mine.  However, Mr. Brandt believes that the presence of titanium, recently identified as a "critical mineral" of the United States, at the Tahawus Mine makes it unlikely that the STB will approve abandonment of the rail lines on the Saratoga Easement.

## V.      Legal Analysis.

### A.      Statutory Framework for Chapter 11 Confirmation.

Although the evidence and argument presented by the parties at times seemed go down a side track, the Court's focus is whether the Debtor's Second Amended Plan should be confirmed.  Toward that end, the Court starts its legal analysis with the statutory framework.  "To be confirmable, a plan must comply with all applicable provisions of 11 U.S.C. § 1129."  *Search Mkt. Direct, Inc. v. Jubber (In re Paige),* 685 F.3d 1160, 1177 (10th Cir. 2012); *see also In re Experient Corp.,* 535 B.R. 386, 400 (Bankr. D. Colo. 2015) (same).

Section 1129(a)(1)–(16) allows for confirmation where each class has either accepted the plan or is not impaired.  *Dill Oil Co., LLC v. Stephens (In re Stephens),* 704 F.3d 1279, 1284 (10th Cir. 2013) (holding that Section 1129(a) "allows for confirmation where each class of creditors consents").  Alternatively, Section 1129(b) provides a so-called "cramdown" mechanism that permits confirmation without the acceptance of each class, provided that additional requirements are satisfied, including

---

[59]      "A Federal Strategy to Ensure Secure and Reliable Supplies of Critical Minerals" Executive Order 13817 (Dec. 20, 2017), 82 Fed. Reg. 60835 (Dec. 26, 2017).

[60]      *Id.*

[61]      "Final List of Critical Minerals 2018," Department of the Interior, 83 Fed. Reg. 23295 (May 28, 2018).  *See also* "Titanium: Critical Mineral Resources of the United States — Economic and Environmental Geology and Prospects for Future Supply," U.S. Geological Survey Professional Paper 1801-T (USGS 2017); "2021 Draft List of Critical Minerals," Department of the Interior, 86 Fed. Reg. 62199 (Nov. 9, 2021) (including titanium as one of 50 "critical minerals" on a draft list subject to further comment and analysis).

that the reorganization plan "does not discriminate unfairly, and is fair and equitable" with respect to non-accepting impaired classes. 11 U.S.C. § 1129(b)(1); *see also Stephens,* 704 F.3d at 1284 (discussing "fair and equitable" requirement).  Section 1129(b) also contains the "absolute priority rule."  *Id.*

The plan proponent "must demonstrate compliance [with Section 1129] by a preponderance of the evidence."  *Paige,* 685 F.3d at 1177.  *See also FB Acquisition Prop. I, LLC v. Gentry (In re Gentry),* 807 F.3d 1222, 1226 (10th Cir. 2015) (confirming that burden of proof is on plan proponent).  In any event, the Bankruptcy Court has an independent duty to ensure compliance with all confirmation standards.  *Cf. United Student Aid Funds, Inc. v. Espinosa,* 559 U.S. 260, 278 (2010) (holding that Bankruptcy Court must independently ensure that Chapter 13 plan complies with Bankruptcy Code); *Kaiser Aerospace & Elecs. Corp v. Teledyne Indus., Inc. (In re Piper Aircraft Corp.),* 244 F.3d 1289, 1299 n.4 (11th Cir. 2001) ("A court must independently satisfy itself that these criteria [11 U.S.C. § 1129] are met. Thus, it must consider facts relating to these criteria even in the absence of an objection."); *Williams v. Hibernia Nat'l Bank (In re Williams)*, 850 F.2d 250, 253 (5th Cir. 1988) (same); *In re Autterson*, 547 B.R. 372, 389 (Bankr. D. Colo. 2016) (same).

## B.   The New York Objection.

### 1.   Right to Be Heard and Standing.

The only remaining objection to the Second Amended Plan is the joint New York Objection submitted by the State of New York, the NY DEC, and the NY Olympic Authority.  As a threshold matter, the Court questions whether the State of New York and the NY DEC truly have the statutory right to be heard or standing to contest confirmation of the Second Amended Plan.

Standing is "a threshold issue in every federal case." *Thomas v. Fed. Nat'l Mortg. Assoc. (In re Thomas),* 469 B.R. 915, 921 (10th Cir. BAP 2012).  The party asserting standing bears the burden of proving standing.  *Id.*; *Lewis v. McCallum (In re Lewis),* 378 B.R. 418 (Table), 2007 WL 2189343, at *4 (10th Cir. BAP Jul. 31, 2007) (unpublished); *Ebel v. King (In re Ebel),* 338 B.R. 862, 869 (Bankr. D. Colo. 2005) ("Once the issue of standing was controverted by the Trustee, the burden was on [the party asserting standing] to offer evidence at trial that would demonstrate his standing."); *B & P Baird Holdings, Inc. v. Boyd (In re B & P Baird Holdings, Inc.),* 2012 WL 4501016, at *3 (W. D. Mich. 2012) (debtor bore the burden of proving standing with evidence).

In Chapter 11 cases, standing considerations are a bit more involved.

> To have standing in bankruptcy court, [parties asserting standing] must meet three requirements: (1) they must meet statutory "party in interest" requirements under § 1109(b) of the bankruptcy code; (2) they must satisfy Article III

constitutional requirements; and (3) they must meet federal
court prudential standing requirements.

*Motor Vehicle Cas. Co. v. Thorpe Insulation Co. (Matter of Thorpe Insulation Co.)*, 677
F.3d 869, 884 (9th Cir. 2012).  And, the need to establish standing in a Chapter 11 case
"is especially pronounced in the area of objections to plan confirmation."  *In re A.P.I.
Inc.*, 331 B.R. 828, 854 (Bankr. D. Minn. 2005) (quoting *In re Myers*, 168 B.R. 856, 862
(Bankr. D. Md. 1994)).

        Although often discussed as part of standing analysis, the first requirement — the
statutory right to be heard — is distinct from traditional constitutional and prudential
standing.  Section 1128(b), which governs Chapter 11 confirmation hearings provides:
"A party in interest may object to confirmation of a plan."  Section 1109(b) identifies
various parties in interest with a right to be heard in Chapter 11 reorganization cases:

                A party in interest, including the debtor, the trustee, a
                creditors' committee, an equity security holders' committee,
                a creditor, an equity security holder, or any indenture trustee,
                may raise and may appear and be heard on any issue in a
                case under this chapter.

But the term "party in interest" is not limited by the list of examples contained in Section
1109(b).  *Vermejo Park Corp. v. Kaiser Coal Corp. (In re Kaiser Steel Corp.)*, 998 F.2d
783, 788 (10th Cir. 1993); *In re Nevel Props. Corp.*, 2012 WL 528179, at *6 (Bankr. N.D.
Iowa Feb. 17, 2012), *aff'd*, 2012 WL 6588546 (N.D. Iowa Dec. 17, 2012), *aff'd*, 765 F.3d
846 (8th Cir. 2014).  "Party in interest" status "is generally understood to include all
persons whose pecuniary interests are . . . directly affected by the bankruptcy
proceedings."  *Nintendo Co., Ltd. v. Patten (In re Alpex Computer Corp.)*, 71 F.3d 353,
356 (10th Cir. 1995).  It is up to the bankruptcy court to determine "whether the
prospective party in interest has a sufficient *stake* in the proceeding so as to require
representation."  *Kaiser Steel*, 998 F.2d at 788 (quoting *In re Amatex Corp.*, 755 F.2d
1034, 1042 (3d Cir. 1985)).  *See also In re Mount Carbon Metro. Dist.*, 1999 WL
34995477, at *3 (Bankr. D. Colo. July 20, 1999) (same).

        In this case, neither the State of New York nor the NY DEC is a creditor, equity
security holder, or indenture trustee.  So, neither falls within the express Section
1109(b) categories.  And, neither the State of New York nor the NY DEC appears to
have any pecuniary interests that are directly affected by the Debtor's bankruptcy case.
In the New Objection, the State of New York asserts that it has standing because it is
"the fee owner of more than half of the land under the Tahawus line [the Saratoga
Easement]."  But, pursuant to the Stipulated Judgment, the State of New York sold the
100-year Saratoga Easement in 1962.  Having sold the Saratoga Easement decades
ago, the State of New York has not shown any current pecuniary interest.  Ditto for the
NY DEC.  The NY DEC asserts only that it "manages the Adirondack Park to conserve
its natural resources and provide recreational access."  But the Saratoga Easement is a

federal easement made specifically for railway purposes.  The NY DEC has not identified a pecuniary interest.

Beyond the Section 1109(b) statutory right to be heard, the State of New York and the NY DEC also were required to show constitutional and prudential standing.  The constitutional minimum for standing flows from the requirement in Article III that there be a "case or controversy" to support the exercise of federal judicial power.  *A.P.I.*, 331 B.R. at 858.  Even if a party passes the constitutional test for standing, the party may not be permitted to participate on "prudential grounds" if: "(a) it is asserting a third party's rights; (b) it alleges a generalized grievance rather than an injury particular to it; or (c) it asserts an injury outside the zone of interest the statute was designed to protect." *Id.*

The Court doubts that the State of New York and the NY DEC pass constitutional and prudential standing muster.  However, the Court will not belabor the point because the Debtor did not directly raise the issue.  And, more importantly, the NY Olympic Authority clearly has a statutory right to be heard under Sections 1109(b) and 1128(b) and has demonstrated constitutional and prudential standing because it is a creditor having submitted a nominal claim against the Debtor for $2,821.00.  Since the New York Objection was made jointly by the NY Olympic Authority, the State of New York, and the NY DEC, the Court is obligated to address all the arguments made in the New York Objection anyway.  So, the Court simply proceeds as if the State of New York and the NY DEC have established a right to be heard and standing.

### 2.     Specific Objections.

New York advanced a handful of overlapping objections to the Second Amended Plan.  First, New York contends that the Second Amended Plan fails to meet the good faith requirement under Section 1129(a)(3) because it is "not feasible."  Second, New York argues that the Second Amended Plan fails to satisfy Section 1129(a)(1) because it references an inapplicable part of the Bankruptcy Code — Section 1165 — and is not in the public interest.  Third, New York asserts that the Second Amended Plan violates Section 1129(a)(7) because the plan is not in the best interests of creditors.  During closing argument, counsel for New York conceded all the other Chapter 11 confirmation requirements under Sections 1129(a) and 1129(b).

### a.     The Second Amended Plan Satisfies Section 1129(a)(1).

Under Section 1129(a)(1), the Court may confirm the Second Amended Plan only if it "complies with the applicable provisions of this title . . . ."  Put another way, Section 1129(a)(1) "requires that proposed plans comply with all of the substantive provisions of Chapter 11." *Colo. Mountain Express, Inc. v. Aspen Limousine Serv., Inc. (In re Aspen Limousine Serv., Inc.)*, 193 B.R. 325, 340 (D. Colo. 1996).  The main thrust of the statutory requirement is to ensure compliance with Bankruptcy Code provisions governing classification of claims and interests and the contents of a plan of reorganization as set forth in Sections 1122 and 1123.  *Id.* (quoting Senate Comm. on

21

Judiciary, S. Rep. No. 95-989, at 124-25 (1978), 1978 U.S.C.C.A.N. 5787, 5904-05); *CRE/ADC Venture 2013, LLC v. Rocky Mountain Land Co., LLC (In re Rocky Mountain Land Co., LLC)*, 2014 WL 1338292, at * (Bankr. D. Colo. Apr. 3, 2014) ("The phrase 'applicable provisions' has been interpreted to include § 1122 . . . ."). Section 1122(a) governs classification of claims and interests and mandates that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class." Section 1123 sets forth the required contents of a Chapter 11 plan.

New York does not argue the typical issues at play under Section 1129(a)(1), such as improper classification of claims and interests or failure to include required reorganization plan content. And, the Court finds that the Second Amended Plan satisfies Section 1122(a) by creating three classes of claims and one class of interests: (1) Class 1 for Allowed Priority Claims; (2) Class 2 for the Allowed Secured Claim of Big Shoulders Capital LLC; (3) Class 3 for Allowed Unsecured Claims; and (4) Class 4 for Equity Interests. The claims and interests within each class are substantially similar to the other claims or interests in such class. Furthermore, the Second Amended Plan includes all the required plan contents under Section 1123.

Instead of addressing the foregoing topics, in the New York Objection, New York argues:

> . . . the [Second Amended] Plan does not "compl[y] with the applicable provisions" of the Bankruptcy Code because it imposes a § 1165 public interest test in a non-railroad bankruptcy. *See* 11 U.S.C. § 1129(a). "Consideration of the public interest is not a statutory criterion for confirmation in non-railroad cases."[62]

New York is correct that in the Initial Plan, the Debtor referenced Section 1165 three times in Article VI Paragraphs 6.1(e)(1)(f), 6.1(g), and 6.1(g)(4)(1). The Court really has no idea why the Debtor made multiple references to Section 1165 in the Initial Plan. Section 1165 is titled "Protection of the Public Interest" and facially applies only in railroad reorganizations under Subchapter IV of Chapter 11.

But, this bankruptcy proceeding in not a railroad reorganization under Subchapter IV of Chapter 11. Indeed, in the Petition, the Debtor itself stated that it was not a "railroad (as defined in 11 U.S.C. § 101(44))." It did so because the Debtor had not been engaged in the transportation of passengers or freight on rail tracks since 2018. Railroad reorganizations "are qualitatively different from non-railroad cases . . . ." *In re Metro Joint Venture LLC*, 2002 WL 32063450, at *3 (Bankr. E.D.N.Y. Jul. 19, 2002). If this case had been a Subchapter IV railroad reorganization, the management of the Debtor (Mr. Brandt) would have been dispossessed of control until a Chapter 11 Trustee was appointed based on recommendations of the Secretary of Transportation. But, of course, no Chapter 11 Trustee has been appointed in this bankruptcy case.

---

[62]    New York Obj. at 7.

And, if this bankruptcy case had been a Subchapter IV railroad reorganization, plan confirmation would be governed by Section 1173 — not Section 1129, the provision of the Bankruptcy Code upon which the Debtor relies.  There are many other differences between railroad and non-railroad insolvencies.  But, suffice to reiterate again that this bankruptcy case most assuredly is not a Subchapter IV railroad reorganization, so, as New York contends, Section 1165 just does not apply at all.  *Metro Joint Venture*, 2002 WL 32063450, at *8 ("Since the debtor does not fit the definition of a railroad under section 101(33), then section 1168 does not apply . . . .").  And, furthermore, consideration of the public interest "is not a statutory criterion for confirmation in non-railroad cases."  *Id*. at *3.

That said, the Debtor later filed the Second Amended Plan.  Apparently in response to the UST Objection and the New York Objection, the Debtor removed every reference to Section 1165.  So, the Debtor's Second Amended Plan moots New York's Section 1129(a)(1) objection entirely.  The UST concurs with that conclusion too because the UST withdrew the UST Objection after the references to Section 1165 were removed in the Second Amended Plan.

 Notwithstanding the removal of all references to Section 1165, New York seems to contend that the Second Amended Plan still cannot be confirmed because Article VI Paragraphs 6.1(e)(1)(f), 6.1(g), and 6.1(g)(4)(1) refer to the "public interest."  All such references are in the Bid Procedures.  Under Paragraph 6.1(e)(1)(f) "every competing Bid must indicate that the potential purchaser shall protect the public interest by assuming the common carrier obligation to preserve future operation of rail service on the Saratoga Easement."  Paragraph 6.1(g) includes a similar concept:  when determining "which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes a Successful Bid," the Plan Administrator may "take into account any factors [he] reasonably deems relevant" including "the public interest as defined by assuming the common carrier obligation to preserve future operation of rail service on the Saratoga Easement."  And, per Paragraph 6.1(g)(4)(1), "[w]hen determining the highest or otherwise best Qualified Bid, as compared with other Qualified Bids," the Plan Administrator may consider" factors that the Plan Administrator deems appropriate" including "the public interest as defined by assuming the common carrier obligation to preserve future operation of rail service on the Saratoga Easement."

But what exactly is wrong with that?  Nothing in the foregoing requires the Court to engage in some sort of free-flowing and likely impermissible public interest analysis.  *In re General Electrodynamics Corp.*, 368 B.R. 543, 548 (Bankr. N.D. Tex. 2007) ("the [Bankruptcy] Code makes no provision for the court to override the requirements of confirmation in favor of the public interest").  Instead, the Debtor made the business judgment[63] that requiring all potential purchasers to assume "the common carrier

---

[63]     With respect to New York's Section 1129(a)(1) objection and hereinafter, the Court repeatedly recognizes the Debtor's sound business judgment in pursuing sale of the Saratoga Easement to Revolution Rail under the APA and through the Second Amended Plan.  New York has not objected to confirmation on the basis of Section 363(b) which governs non-ordinary course sales transactions.  And, perhaps any such objection would be premature since the Debtor has not requested that the Court

obligation to preserve future operation of rail service on the Saratoga Easement" is the best way to ensure that any proposed sale of the Saratoga Easement will gain the STB approval necessary to close the sale expeditiously and realize the best value.  That is the Debtor's judgment.  The Debtor provided substantial and compelling testimony supporting such judgment.  And, 90% of creditors by number and 99.95% of creditors by claim value agree.  New York apparently disagrees with the majority of creditors but did not provide any compelling evidence contrary to the Debtor's assessment.  In any event, disagreement as to business judgment is not a valid objection under Section 1129(a)(1), which requires the Court to consider whether the Second Amended Plan "complies with" the Bankruptcy Code.[64]  The Debtor has met its confirmation burden under Section 1129(a)(1).

### b.      The Second Amended Plan Satisfies Section 1129(a)(3).

Under Section 1129(a)(3), the Court may confirm the Second Amended Plan only if it "has been proposed in good faith and not by means forbidden by law."  The Bankruptcy Code does not define the flexible concept of "good faith."  However, the Tenth Circuit has twice endorsed the following standard:

> The test of good faith is met if there is a reasonable likelihood that the plan will achieve its intended results which are consistent with the purposes of the Bankruptcy Code, that is, is the plan feasible, practical, and would it enable the company to continue its business and pay its debts in accordance with the plan provisions.

*Paige,* 685 F.3d at 1178 (quoting *Travelers Ins. Co. v. Pikes Peak Water Co. (In re Pikes Peak Water Co.),* 779 F.2d 1456, 1459 (10th Cir.1985)).  In assessing good faith, "courts have looked to whether the debtor intended to abuse the judicial process and the purposes of the reorganization provisions."  *Paige,* 685 F.3d at 1179; *Pikes Peak*

---

formally approve a specific sales transaction under Section 363(b).  But it bears mentioning that the "'business judgment' test applies to determine whether a sale under § 363(b) should be approved."  *Allen v. Absher (In re Allen)*, 607 Fed. Appx. 840, 843 (10th Cir. 2015) (unpublished); *see also In re Colo. Sun Oil Processing LLC,* 2011 WL 3585565 (Bankr. D. Colo. Apr. 12, 2011) (endorsing business judgment test); *In re Castre, Inc.*, 312 B.R. 426, 428 (Bankr. D. Colo. 2004) (same).  In making a "business judgment" determination, a Court should consider "evidence of [1] '[a]ny improper or bad motive,' whether [2] '[t]he price is fair and the negotiations or bidding occurred as arm's length,' and [3] whether the trustee followed '[a]dequate procedures, including proper exposure to the market and accurate and reasonable notice to all parties in interest.'"  *Allen*, 607 Fed. Appx. at 843.  In evaluating such factors, the Court "should give deference to a trustee's judgment in pursuing a sale motion."  *Colo. Sun Oil*, 2011 WL 3585565, at *9.  Thus, the Court deems it important to note in several parts of this Opinion that the Debtor has engaged in sound business judgment in pursuing the APA with Revolution Rail under the Second Amended Plan.

[64]     New York also argues in the alternative that the Second Amended Plan is "not in the public interest."  New York relies on Section 1165 as a basis for the Court to consider public interest and seems to ask the Court to decide whether railroad operations or so-called "rail banking" under 16 U.S.C. § 1247(d) and 42 C.F.R. § 1152.1 *et seq.* is the more important public interest.  The Court declines the invitation because, as already explained, Section 1165 is inapplicable in this bankruptcy case.  So, there is no need for the Court to engage in a comparative public interest assessment.

*Water,* 779 F.2d at 1460.  A standard such as "good faith" requires a court to assess the "totality of the circumstances."  *Rocky Mountain Land,* 2014 WL 1338292, at *9.  Put another way, in addition to assessing technical compliance with the Bankruptcy Code and feasibility, the Court also should consider "whether a plan is proposed with honesty and sincerity" and "whether a plan's terms or the process used to seek its confirmation was fundamentally fair."  *In re Riviera Drilling,* 2012 WL 6719591, at *5 (Bankr. D. Colo. Dec. 12, 2012) (citing *In re Global Water Techs., Inc.,* 311 B.R. 896, 903 (Bankr. D. Colo. 2004)).

New York limited its Section 1129(a)(3) objection to feasibility:

> New York objects to the [Second Amended] Plan because it is not feasible, and thus cannot satisfy the [Section 1129(a)(3)] good faith standard . . . .

> The Plan is not feasible because it requires approval of the Surface Transportation Board, which has already rejected a request for approval from the stalking horse bidder . . . .

> [And] as a related matter, holding the auction after confirmation makes it impossible to determine feasibility.[65]

Notably, New York does not attack the "honesty and sincerity" of the Debtor.  Nor does New York suggest that the Debtor is engaging in "an abuse of the judicial process."  Indeed, to the contrary, the evidence dictates that the Debtor is engaged in an honest, sincere and non-abusive effort to promptly confirm the Second Amended Plan, sell the Saratoga Easement, pay creditors, and exit bankruptcy.

So on to feasibility.  Although not referenced by New York, feasibility considerations are also implicated by Section 1129(a)(11) as well as Section 1129(a)(3).  The concept is similar.  The purpose of the feasibility requirement:

> "is to prevent confirmation of visionary schemes which [promise] creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation" . . . "In determining whether [a plan] is feasible, the bankruptcy has an obligation to scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable."

*Pikes Peak Water*, 779 F.2d at 1460 (quoting *Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) and *Prudential Ins. Co. of America v. Monnier (In re Monnier)*, 755 F.2d 1336, 1341 (8th Cir. 1985)).  Furthermore, bankruptcy debtors "are not required to guarantee success of the plan."  *Cf. Ames v. Sundance State Bank (In re Ames)*, 973 F.2d 849, 851 (10th Cir. 1992) (assessing

---

[65]     New York Obj. at 4-6.

feasibility in Chapter 12).  "Put differently, a feasible plan is not a guarantee of success but rather offers a reasonable assurance of success."  *Gentry*, 807 F.3d at 1225.

New York's main argument against feasibility is that the STB "already rejected a request for approval from the stalking horse bidder."  In the Court's view such argument is without merit.  Factually, it is true that Revolution Rail acted prematurely by filing with the STB (on August 11, 2021) "a verified notice of exemption under 49 C.F.R. § 1150.31 to acquire from [the Debtor] approximately 29.71 miles of rail line [constituting the Saratoga Easement]."[66]  And, a month later, the STB denied Revolution Rail's request.

However, contrary to the argument advanced by New York, such denial was only procedural — not on the merits.  The STB found that "the proposed acquisition does not qualify as a routine matter appropriate for the class exemption procedures."[67]  The STB further explained:

> . . . there is uncertainty here because [Revolution Rail] does not already have an agreement with [the Debtor] to acquire the Line, and [Revolution Rail] does not know whether it will be the successful bidder . . . [and because] there is no indication in the record that a schedule for the bidding process has been established in the bankruptcy proceeding.[68]

The STB also  stated that it was "not clear [whether Revolution Rail] is interested in providing freight rail service rather than solely rail biking."[69]  So, the STB found Revolution Rail's request premature and unclear.  That seems quite appropriate and correct.

But, the STB's denial of Revolution Rail's premature and unclear prior request does not in any way establish that the STB is unlikely to approve a future mature and clear request which may be made by Revolution Rail for approval of the APA (or any future request from any other potential purchaser who may prevail in the auction for the Saratoga Easement).  On close scrutiny, New York presented no evidence negating feasibility.

However, the Debtor bears the burden of proving good faith, including feasibility.  The Debtor's evidence more than satisfied the Debtor's confirmation burden.  The evidence proved that the Debtor has engaged in an extensive effort to market and sell the Saratoga Easement for the benefit of creditors.  The Debtor set up a data room and entered into Non-Disclosure Agreements with about 15-20 interested parties.  The Debtor conducted negotiations with numerous interested parties and ultimately entered

---

[66]     STB Decision Docket No. FD 36535, Debtor's Ex. 9 (the "STB Revolution Rail Exemption Denial").
[67]     *Id.*
[68]     *Id.*
[69]     *Id.*

into the APA with Revolution Rail.  So, the Second Amended Plan is not some sort of pie-in-the-sky "visionary scheme."  The Debtor has already secured a stalking horse buyer.  The APA is part of the Second Amended Plan.  And, the President and General Counsel of Revolution Rail testified that the company is ready to proceed under the APA to acquire the Saratoga Easement.

New York suggests that determining feasibility is "impossible" if a sale or auction is held after plan confirmation.  Instead, New York seemed to advocate for "a court supervised auction prior to confirmation . . . ."  But, it is entirely proper for a debtor to include sale provisions in a Chapter 11 plan rather than being forced to engage in a pre-confirmation sale under Section 363(b).  Indeed Section 1123(a)(5)(D) contemplates exactly the approach pursued by the Debtor and states that the contents of a Chapter 11 plan must include "adequate means for the plan's implementation, such as . . . sale of all or any part of the property of the estate . . . ."  And post-confirmation sales are common in Chapter 11.  There is simply no requirement that a bankruptcy debtor sell all of its assets pre-confirmation and then use the plan process merely as a distribution mechanism.

STB approval of the sale of the rail lines in the Saratoga Easement generally is required, subject to possible exemption.[70]  The process is not lengthy.[71]  With respect to approval of acquisitions, the STB generally must approve such proposed acquisition "unless the Board finds that such activities are inconsistent with the public convenience and necessity."  49 U.S.C. §§ 10901(c) and 10902(c).  In the end, there is "no guarantee" that the STB will approve the acquisition of the Saratoga Easement by Revolution Rail or another purchaser, nor that it would grant an exemption from such approval process.  However, the Debtor cogently explained that it structured the transaction to maximize the odds that the STB will approve the sale.  On the other hand, New York has not offered any evidence that acquisition of the Saratoga Easement by Revolution Rail or another purchaser would be "inconsistent with the public convenience and necessity" and therefore denied by the STB, especially since the Saratoga Easement itself is premised on railroad operations and contains rail lines.  New York also has not offered evidence tending to show that a timely and proper request for exemption would be denied by the STB.  Without in any way intending to interfere in the STB's own analysis and deliberative process, the Court concludes (based on the

---

[70]   *See* 49 U.S.C. § 10501(b) ("The jurisdiction of the Board over . . . (2) the construction, acquisition, operation, or abandonment or discontinuance of [rail lines] . . . is exclusive."); 49 U.S.C. § 10502 (providing for  potential exemption); 49 U.S.C. § 10901(a) (A person may . . .  in the case of a person other than a rail carrier, acquire a railroad line . . . only if the Board issues a certificate authorizing such activity . . . ."); 49 U.S.C. § 10902(a) ("A Class II or Class III rail carrier providing transportation subject to the jurisdiction of the Board under this part may acquire or operate an extended or additional rail line under this section only if the Board issues a certificate authorizing such activity . . . ."); 49 U.S.C. § 11323(a) ("The following transactions involving rail carriers providing transportation subject to the jurisdiction of the Board under this part may be carried out only with approval and authorization of the Board . . . . (6) Acquisition by a rail carrier of trackage rights over . . . a railroad line . . . ."); 49 C.F.R. § 1150.1 (governing acquisition of rail lines); 49 C.F.R. §§ 1150.31 and 1150.41 (governing various types of exemptions).
[71]   49 C.F.R. § 1150.1 (describing approval process for acquisition of rail lines); 49 C.F.R. §§ 1150.32 and 1150.42 (describing exemption processes).

evidence at the Confirmation Hearing) that there is at least a "reasonable prospect" and "reasonable likelihood" that the Debtor and/or a potential purchaser will be able to secure STB approval (or an exemption) and close a sale of the Saratoga Easement. That is all that is required to meet the good faith and feasibility requirements of Section 1129(a)(3).

### c.    The Second Amended Plan Satisfies Section 1129(a)(7).

New York also objects to the Second Amended Plan under Section 1129(a)(7). That statute provides that the Court may confirm the Second Amended Plan only if:

> With respect to each impaired class of claims or interests —
>
> (A) each holder of a claim or interest of such class —
>
> > (i)    has accepted the plan; or
> >
> > (ii)    will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

Section 1129(a)(7) is commonly known as the "best interests of creditors" test.  A key bankruptcy treatise accurately and concisely describes the meaning and purpose of Section 1129(a)(7) in plain language:

> Section 1129(a)(7) is one of the cornerstones of chapter 11 practice.  It is an individual guaranty to each creditor or interest holder that it will receive as least as much in reorganization as it would in liquidation.  With this guaranty in place, the [Bankruptcy] Code assumes that any value over and above liquidation value is subject to negotiation and debate, and its allocation subject to group vote rather than individual demand.

Richard Levin and Henry J. Somer, 7 COLLIER ON BANKRUPTCY ¶ 1129.02[7] (LexisNexis Supp. 2021).

New York's Section 1129(a)(7) argument is quite sparse.  Quoting *In re Experient Corp.*, 535 B.R. 386, 411 (Bankr. D. Colo. 2015), it states that:

> Section 1129(a)(7) requires that the plan either be accepted by each impaired class, or provide that each non-accepting

28

> member receive at least as much as they would in a Chapter
> 7 liquidation.

True enough.  Then, New York claims that the Second Amended Plan

> . . . prohibits a proposal for more than twice the amount of
> the stalking horse bidder.  It is not even clear that this
> Chapter 11 plan can justify the additional administrative
> expenses it incurs from having a chapter 11 trustee instead
> of a chapter 7 liquidating trustee.  Thus, the Plan is not in the
> best interest of creditors.[72]

Both points are off the rails.  The Second Amended Plan does not "prohibit" proposals for the Saratoga Easement.  Instead, it only establishes Bid Procedures and an auction process all based upon the stalking horse APA.  The Bid Procedures do require that "[e]ach and every competing Bid must indicate that the potential purchaser shall protect the public interest by assuming the common carrier obligation to preserve the future operation of rail service on the Saratoga Easement."  This requirement does not preclude OSI from bidding to purchase the Saratoga Easement.  To the contrary, it simply establishes a qualification for OSI and every potential auction participant which might like to outbid Revolution Rail.  Should OSI choose to submit a bid under the Second Amended Plan, nothing prohibits it from doing so as long it makes the same commitment required of all potential purchasers.  And, as explained previously, the Bid Procedures contained in the Second Amended Plan are deemed necessary in the Debtor's business judgment.  Further, the evidence establishes that the Bid Procedures including such qualification are more likely to result in a transaction that can close quickly, thereby maximizing value for creditors.

The second issue asserted by New York is compensation of "a chapter 11 trustee" in the Second Amended Plan.  New York suggests that "a chapter 11 trustee" will be more expensive and result in "additional administrative expenses" as compared to a Chapter 7 trustee.  However, the Second Amended Plan does not even involve "a chapter 11 trustee."  Instead, the Reorganized Debtor will be "managed, operated, and controlled by [a] Plan Administrator."[73]  Mr. Brandt will serve as the initial Plan Administrator.[74]  The Second Amended Plan does not provide that the Plan Administrator will receive any compensation.  In the Second Amended Disclosure Statement, the Debtor explained that "the Plan Administrator will not receive any compensation for his services from the Saratoga estate."[75]  At the Confirmation Hearing, Mr. Brandt reiterated that he will not receive any compensation as Plan Administrator.  So, New York's argument is flat wrong.  The proposed Plan Administrator in the Second Amended Plan will be less expensive than a Chapter 7 trustee.

---

[72]     Docket No. 108 at 14.
[73]     Second Amended Plan at Article VII.
[74]     *Id.* at § 1.38.
[75]     Second Amended Disclosure Statement at § VII(B).

In addition to the foregoing, New York repeatedly suggests that the OSI Bid offers a higher price than the Revolution Rail APA.  And, then New York contends that the Second Amended Plan should be denied because the OSI Bid is superior in price. That argument completely ignores the Second Amended Plan's structure, which contemplates using the APA as a stalking horse bid with a potential auction which may generate an even larger offer.  Furthermore, the evidence does not establish that the OSI Bid (which itself was not even admitted into evidence) is superior to the APA in the sense of promptly realizing value for creditors.  The Debtor elected not to pursue the OSI Bid at this stage.  Mr. Brandt explained why in convincing terms.

As best the Court understands based on the very limited information provided by New York, the OSI Bid is predicated on the STB's approval of a "rail banking" or "rails-to-trails" proposal under 16 U.S.C. § 1247(d).[76]  *See Preseault v. I.C.C.*, 110 S. Ct. 914, 918 (1990) (referring to 16 U.S.C. § 1247(d) as a "federal rails-to-trials statute under which unused railroad rights-of-way are converted into recreational trails"); *Friends of the Atglen-Susquehanna Trail, Inc. v. S.T.B.*, 252 F.3d 246, 251 (3d Cir. 2001) (using term "rail banking" in referring to 16 U.S.C. § 1247(d)).  Rail banking involves multiple steps.  Per the OSI Bid, the Debtor would have to obtain STB approval to abandon (or possibly discontinue use) of the rail lines on the Saratoga Easement and then enter into an interim trail use agreement with OSI.  To do so:

> A rail carrier intending to abandon, and to be released from its obligations to retain or operate, any part of its railroad lines must file an application to do so with the STB and such abandonment must adhere to certain established procedures.

---

[76]     16 U.S.C. § 1247(d) states:

The Secretary of Transportation, the Chairman of the Surface Transportation Board, and the Secretary of the Interior, in administering the Railroad Revitalization and Regulatory Reform Act of 1976 (45 U.S.C. 801 et seq.) and chapter 224 of Title 49, shall encourage State and local agencies and private interests to establish appropriate trails using the provisions of such programs.  Consistent with the purposes of that Act, and in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.  If a State, political subdivision, or qualified private organization is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way, then the Board shall impose such terms and conditions as a requirement of any transfer or conveyance for interim use in a manner consistent with this chapter, and shall not permit abandonment or discontinuance inconsistent or disruptive of such use.

*Friends of the Atglen-Susquehanna*, 252 F.3d at 251.  Any application to abandon or discontinue use of the Debtor's rail line on the Saratoga Easement would be governed by 49 U.S.C. § 10903 and 49 C.F.R. §§ 1152.1-1152.60.

According to Mr. Brandt, the legal standard for the STB to approve an application to abandon or discontinue use requires the STB to determine there is no present or future public need for rail service over the Saratoga Easement and that abandonment will not have serious, adverse impact on rural and community development.  That testimony squares with the applicable statute, 49 U.S.C. § 10903(d), which states:

> A rail carrier providing transportation subject to the jurisdiction of the Board under this part may —
>
> > (1) abandon any part of its railroad lines; or
> > (2) discontinue the operation of all rail transportation over any part of its railroad lines;
>
> only if the Board finds that the present or future public convenience and necessity require or permit abandonment or discontinuance.  In making the finding, the Board shall consider whether the abandonment or discontinuance will have a serious, adverse impact on rural and community development.

Applying the foregoing standard, the Debtor has concluded that the STB likely will not approve abandonment (or discontinuance) of the rail lines on the Saratoga Easement (which is a predicate to the OSI Bid) because, among other things: (1) "the present or future public convenience and necessity" do not "require or permit abandonment or discontinuance"; (2) the Town of Newcomb, New York opposes abandonment for economic development reasons; (3) Essex County, New York opposes abandonment for economic development reasons; and (4) the Tahawus Mine contains titanium which is a "critical mineral."[77]  The President of the United States has declared that critical minerals (such as titanium) are those minerals which are

> (i) . . . essential to the economic and national security of the United States, (ii) the supply chain of which is vulnerable to disruption, and (iii) that serves an essential function in the manufacturing of a product, the absence of which would have significant consequences for our economy and national security.[78]

Since efficient and economical titanium mining at the Tahawus Mine will require railroad transportation services, the Debtor reasons that the STB is unlikely to strand such a

---

[77]    "A Federal Strategy to Ensure Secure and Reliable Supplies of Critical Minerals" Executive Order 13817 (Dec. 20, 2017), 82 Fed. Reg. 60835 (Dec. 26, 2017).
[78]    *Id*.

"critical mineral" by approval of abandonment or discontinuance of the rail lines on the Saratoga Easement. All of the foregoing is a completely rational business judgment of the Debtor and fully supported by the evidence. Certainly, the Court has heard nothing to suggest that "the present or future public convenience and necessity require or permit abandonment or discontinuance." At very least, the OSI Bid seems uncertain and may cause delay. Without in any way intending to interfere in the STB's own analysis and deliberative process, the Court concludes (based on the evidence at the Confirmation Hearing) that there is at least a reasonable likelihood that under the circumstances present in this case, OSI may not be able to secure contested STB approval for abandonment or discontinuance of the rail lines on the Saratoga Easement. So, at least under the current circumstance and evidence, it does not appear that the OSI Bid is superior to the APA.

In the end, the central statutory focus of Section 1129(a)(7) is a liquidation comparison which boils down to whether the Debtor can obtain more money for creditors than a Chapter 7 trustee. The Debtor has met its burden on the point through testimony as well as its Liquidation Analysis which shows that the liquidation value that a Chapter 7 trustee likely would obtain by selling the rails (for steel scrap), rail ties, ballast, and switches on the Saratoga Easement would net about $405,000.00 to $585,000.00.[79] A Chapter 11 trustee would be entitled to presumptive compensation on distributing such amount under Section 326. *Connolly v. Morreale (In re Morreale)*, 959 F.3d 1002, 1007 (10th Cir. 2020) ("Section 326(a) provides that a Chapter 7 trustee may receive compensation as a percentage of 'all moneys disbursed or turned over in the case by the trustee to parties in interest.'") (emphasis omitted). Thus, a Chapter 7 case would have higher administrative expenses than proceeding in Chapter 11 because, unlike a Chapter 7 trustee, the Plan Administrator will not charge any compensation under the Second Amended Plan. And, there is no evidence suggesting that somehow the Chapter 7 trustee could obtain more for sale of the Saratoga Easement than the Debtor through the APA (especially since the OSI Bid appears uncertain). Based upon the foregoing, the Debtor has met its burden under Section 1129(a)(7).

**C.     Other Confirmation Requirements.**

As set forth above, New York objected to confirmation of the Second Amended Plan only under Sections 1129(a)(1), (3), and (7). The Court already has determined that the Debtor satisfied the requirements of those parts of the Bankruptcy Code. However, that does not end the inquiry because the Court has an independent duty to ensure compliance with all confirmation standards. *Espinosa,* 559 U.S. at 278; *Kaiser Aerospace*, 244 F.3d at 1299 n.4; (11th Cir. 2001); *Autterson*, 547 B.R. at 389.

To satisfy such obligation, the Court has engaged in a searching inquiry examining the Second Amended Plan, the evidence, and all requirements of Sections 1129(a) and 1129(b) (because the Debtor seeks confirmation by cram-down).[80] In the

---

[79]     Debtor's Ex. 4 (Liquidation Analysis).
[80]     The Court is not quite convinced that "cram-down" of the Second Amended Plan is necessary under Section 1129(b) because all the Class 4 Interests are owned by the SL&RG which supports the

absence of an objection and to preserve judicial resources, the Court elects not to engage in an extended explanation of the other uncontested confirmation requirements. Suffice it for the Court to decide that the Debtor met its burden to prove entitlement to confirmation of the Second Amended Plan under Sections 1129(a)(2), (4), (5), (9), (10), (11), (12), and (16).  No party has argued otherwise.  The following additional parts of 1129(a) are inapplicable in this bankruptcy case:  Sections 1129(a)(6), (13), (14), and (15).  Thus, the Debtor satisfied all of Section 1129(a) with the possible exception of Section 1129(a)(8), since Class IV Interests were impaired but did not vote.  The Debtor argues that it must meet the requirements for cram-down per Section 1129(b).  The Court decides, on an uncontested basis, that the Debtor met the cram-down requirements of Section 1129(b) because the Second Amended Plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

## VI.    <u>Conclusion.</u>

For the reasons set forth above, the Court concludes that the Debtor met all requirements for confirmation.  Accordingly, the Court orders that the Second Amended Plan is confirmed.

DATED this 13th day of January, 2022.

BY THE COURT:

Thomas B. McNamara,
United States Bankruptcy Judge

---

Second Amended Plan and controls the Debtor.  However, the Debtor itself contended repeatedly that it should be held to the higher cram-down standard under Section 1129(b).  Of course, New York did not suggest otherwise.  So, the Court accepts the Debtor's contention.